STATE OF INDIANA *v.* LINCOLN MEMORY GARDENS, INC.

[No. 29,981. Filed October 26, 1961.]

118 N. E. 2d 800; *Beach* v. *LeRoy* (1950), 228 Ind. 122, 89 N. E. 2d 912.

However this rule does not apply to the facts in the case at bar.

*Edwin K. Steers,* Attorney General, and *Robert E. Robinson,* Deputy Attorney General, for appellant.

. *Paul J. DeVault, Arthur W. Banta, Krieg, DeVault, Alexander & Capehart,* of counsel, all of Indianapolis, *Russell I. Richardson* and *Stewart & Richardson,* of counsel, of Lebanon, for appellee.

·· Bobbitt, J.—In 1953 appellee purchased 38.03 acres of land in a farming community in Boone County, Indiana, for the purpose of establishing and developing a garden-type cemetery. The land adjoins State Road 52 a few miles northwest of Indianapolis.

A plat of the entire tract of land was filed in the Recorder's office in Boone County, on January 13, 1954, as Lincoln Memory Gardens, and a further plat was so filed on February 20, 1955.

· The individual grave markings are set flush with the lawn, and the cemetery is composed of special gardens or burial areas designed around some religious art feature which identifies that particular garden.

Detailed plats of the special gardens were also recorded and on November 7, 1956, a plat of the "Garden of the Last Supper" which is located in the northeast part of the cemetery and includes the land here in question, was placed of record.

Appellee established a perpetual care fund for the cemetery as provided by law, and has paid into such fund a sum in excess of $64,000, and has spent on the development and improvement of the cemetery a sum in excess of $175,000.

At the time of the trial 15,200 burial spaces had been sold in the entire cemetery area. In the "Garden of the Last Supper" 876 burial lots were wholly appropriated by the State, and 2,845 burial lots were affected by the location of the highway.

Although this Garden has not been developed beyond the point of platting and recording of the plat, 1,162 burial lots in the "Garden of the Last Supper" had been sold at the time of the trial, 63 of which were among those appropriated by the State.

On September 22, 1958, the appellant, State of Indiana, filed an action to condemn a strip of land containing approximately 0.599 acres and running diagonally across the northeast corner of the cemetery through the "Garden of the Last Supper," for the purpose of constructing a limited access highway.

Exceptions to the award of the court-appointed appraisers were filed by both the appellant and appellee herein. Trial was had by jury which found for the defendant-appellee and assessed damages in the sum of $23,600, with interest at 6% from May 2, 1959. Judgment was entered accordingly.

*First:* By Specification No. 14 of its motion for a new trial the State asserts that the trial court erred in refusing to permit a witness to testify that she was willing to sell three-fourths of an acre of land adjoining the cemetery and suitable for burial purposes for the sum of $1,500, and in refusing to give the State's tendered Instruction No. 12, which is as follows:

> "The Court instructs you that in determining the damages sustained by defendant you may take into consideration the availability of land adjoining the remaining Lincoln Memory Garden property, the willingness or unwillingness of the adjacent owner or owners to sell and whether or not said land or lands are suitable as a replacement or substitute for the property taken."

By this specification the State raises the question of the proper basis of the measure of damages involved in the appropriation of the strip of land across one corner of the cemetery here in question, and urges upon us the application of the principle of substitution.

The principle of substitution has not been recognized in this jurisdiction as an element of value in determining the amount of damages to be assessed in eminent domain proceedings. The question here presented is one of first impression in Indiana. However, appellant has furnished us with no authority from other jurisdictions in support of its position here, but relies wholly upon statements from the appraisers' book, "The Appraisal of Real Estate" (1951),[1] published under the direction of the Educa-

---

1. The principle of substitution is stated generally in this work as follows:

"1. The cost of acquisition of an equally desirable substitute property, without serious delay, ordinarily sets the upper limit of value.

tion Committee, American Institute of Real Estate Appraisers, Chicago, Illinois.

The rule by which we must be governed in this case has been firmly established in Indiana by statute[2] and the decisions of this court.[3]

In fixing damages for the condemnation and appropriation of a part of a tract of land such as is here involved, consideration shall be given to ■ the fair market value of the parcel appropriated; the fair market value of the improvements thereon, if any; the damage, if any, to the residue of the land caused by the taking of the parcel; and such other damages, if any, as will result from the construction of the proposed improvement. Acts 1935, ch. 76, §3, p. 228, being §3-1706, Burns' 1946 Replacement. *State* v. *Stabb* (1948), 226 Ind. 319, 79 N. E. 2d 392; *Southern Indiana Gas and Electric Co.* v. *Gerhart* (1961), 241 Ind. 389, 172 N. E. 2d 204, 205; 11 I. L. E., Eminent Domain, §53, p. 610. See also: *Alberson Cemetery Assn.* v. *Fuhrer* (1923), 192 Ind. 606, 613, 137 N. E. 545; *State* v. *Tibbles et al.* (1954), 234 Ind. 47, 51, 123 N. E. 2d 170; *Northern Ind. Pub. Serv. Co.* v. *McCoy et ux.* (1959), 239 Ind. 301, 157 N. E. 2d 181, 186.

Although the principle of substitution (tending to set the value of property that is replaceable by the

---

"2. Value-in-use to an owner tends to become synonymous with value-in-exchange in the market (market value).

"3. The indemnity to which an owner is entitled, if deprived of the use of his property, is not its value to him but rather the cost of substitution.

"4. Value tends to be synonymous with market value."

2. Acts 1935, ch. 76, § 3, p. 228, being § 3-1706, Burns' 1946 Replacement.

3. *State* v. *Ahaus* (1945), 223 Ind. 629, 63 N. E. 2d 199; *Southern Indiana Gas and Electric Co.* v. *Gerhardt* (1961), 241 Ind. 389, 172 N. E. 2d 204, 205.

cost of acquisition of an equally desirable substitute property) has not been considered by this court, we have recently held[4] that one may not be excluded from a certain building zone under a zoning ordinance on the ground that he could find a comparable site outside the zone in which his property was situated.

While there is a distinction between the zoning of property and the exercise of the right of eminent domain, the denial of a zoning variance because an equally suitable substitute property might be available in another zone, has the same effect as denying a condemnee the right to proper damages for land taken in a condemnation proceeding, because an equally suitable substitute property might be available to him as a replacement for the property taken.

One who has his land taken in an eminent domain proceeding by being compelled to accept in lieu thereof an equally desirable property or tract of land, is deprived of his property as effectively and completely as is one who is denied a zoning variance on the ground that an equally suitable and valuable property is available to him in a zone other than the one in which his property is situated. In our judgment the rule of substitution in zoning proceedings as announced in *Board of Zoning Appeals of Meridian Hills* v. *Schulte* (1961), 241 Ind. 339, 172 N. E. 2d 39, 40, applies with equal force to the substitution of equally suitable land, or its value, for that appropriated in eminent domain proceedings.

"The principle of substitution, i.e., replacement cost, is not germane. Where the taking splits apart property which is held in one parcel and

4. *Board of Zoning Appeals of Meridian Hills* v. *Schulte* (1961), 241 Ind. 339, 172 N. E. 2d 39, 40.

used for a single purpose by the building of a heavily traveled highway through the property leaving a truncated section, restoration of the use of the property as a unified and combined whole is manifestly impossible. The land taken is irreplaceable by the substitution of other land in a different location. Replacement cost has not been admitted as evidence in measuring the value of vacant land. The same rule applies to condemnor as condemnee." (Citing authorities.) *St. Agnes Cemetery* v. *State* (1957), 3 N. Y. 2d 37, 163 N. Y. S. 2d 655, 143 N. E. 2d 377, 383, 62 A. L. R. 2d 1161, 1170.

A mere offer to buy or sell property is not a measure of the market value of a similar property. It is incompetent to prove the market value of property because the asking price is only the opinion of one who is not bound by his statement, and is too unreliable to be accepted as a correct test of value.

A witness in an eminent domain proceeding may state the cost of a particular property at a given place in order to establish the value of a similar property. But evidence of the price for which someone might be willing to sell such similar property or how much he may have refused to take for it, would not tend to prove the market value of the property taken. *Mackey* v. *State* (1943), 220 Ind. 607, 609, 45 N. E. 2d 205; *Indianapolis, etc., Traction Co.* v. *Wiles* (1910), 174 Ind. 236, 241, 91 N. E. 161; *Lehmicke, Administrator* v. *The St. Paul, Stillwater & Taylor's Falls Railroad Co.* (1873), 19 Minn. 464, 483; *Williams et al.* v. *Hewitt* (1910), 57 Wash. 62, 66, 106 Pac. 496; *New Jersey Turnpike Authority* v. *Bowley* (1958), 27 N. J. 549, 556, 143 A. 2d 558; *State* v. *Morehouse Holding Company* (1960), Ore., 357 P. 2d 266, 267; *State* v. *McDuffie*

(1960), 240 La. 378, 391, 123 So. 2d 93; *Atlantic Coast Line R. Co.* v. *United States* (1943), 5 Cir., 132 F. 2d 959, 963; *United States* v. *Regents of New Mexico School of Mines,* 10 Cir. (1950), 185 F. 2d 389, 391; See also: 7 A. L. R. 2d 781, Anno.

The testimony of the witness herein that she was willing to sell three-fourths of an acre of land to appellee for the sum of $1,500 as a replacement for the land taken by the State, should not have been admitted over proper objection, because her asking price was not a true test of the market value of appellee's land taken by the State.

For the foregoing reasons we decline to adopt the principle of substitution as an element to be considered in the assessment of damages in eminent domain proceedings. The trial court did not err in excluding such testimony or in refusing to give State's tendered Instruction No. 12.

Having decided that the principle of substitution does not apply here, we now proceed to a consideration of the other questions presented under the rules of law as they presently maintain in this jurisdiction.

*Second:* Appellant further asserts that the trial court erred in refusing to give its tendered Instruction No. 10, which is as follows:

"The Court instructs you that you may consider, in arriving at your verdict, the value of surrounding comparable property."

We find no fault with the instruction as tendered, if there is evidence of the value of comparable property in the area in the record to which such instruction might be applicable.

The appropriateness of an instruction is to be determined not by whether it correctly states the law

upon a given state of facts, but whether it correctly states the law revelant to issuable facts as they are established by the evidence in the trial. *Indiana R. Co.* v. *Maurer* (1903), 160 Ind. 25, 31, 66 N. E. 156; 28 I. L. E., Trial, §223, p. 227.

The State has failed to direct our attention to any evidence of the value of comparable property.

While the instruction here in question correctly states an abstract rule of law it is, in our judgment, not applicable to any revelant facts in the record here. For this reason the trial court did not err in refusing to give appellant's tendered Instruction No. 10.

*Third:* Appellant further asserts that the verdict of the jury is not sustained by sufficient evidence and is contrary to law because it exceeds the highest estimate of damages based upon competent evidence; and that appellee's evidence is incompetent because it is based upon the premise "that the area taken was suitable for burial purposes."

Based upon the premise that the land was saleable as burial lots as shown by the recorded plat, one witness for appellee testified that the fair market value of the land appropriated was $35,000; another, a real estate appraiser, $26,500; and another witness for appellee, also a real estate appraiser, $26,500. One of such real estate appraisers testified that the damages resulting to the residue of the cemetery from the construction of the highway herein were $17,261, and the other $22,225.

Further evidence in the record here discloses that the President and Treasurer of appellee-corporation, and owner of all of its stock, has been engaged in the business of developing cemeteries and selling

interment lots continuously since 1946; that he started as a salesman, succeeding to sales manager, then district manager over a number of cemeteries for several years. He was manager of a cemetery property at Evansville, Indiana, and then established and developed Lincoln Memory Gardens, involved herein, as his own business venture. He caused the land here in question to be irrevocably dedicated for cemetery purposes, incurred and paid for the expense of surveying and platting the same, and caused his company to assume contractual obligations for making the entire area suitable for burial purposes.

The evidence further shows that the area was platted by experienced and qualified cemetery architects; that 370 families have purchased 1,162 interment lots in the "Garden of the Last Supper," and 15,200 burial spaces have been sold in the entire cemetery area; and that 253 interments already have been completed in the same number of such lots.

From the foregoing evidence the jury could have found that if the Garden here in question was developed in the manner required by appellee's contractual obligations as shown by the evidence, it would be suitable for burial purposes. Such finding is not based upon some future speculative use, but upon a present fact of the most advantageous use.[5]

The value of the burial lots in Lincoln Memory Gardens was determined by the witnesses of appellee by referring to the net sales price which appellee had received for lots already sold in the particular area here in question, and in adjoining garden sections.

5. See: *St. Agnes Cemetery* v. *State* (1957), 3 N. Y. 2d 37, 163 N. Y. S. 2d 655, 143 N. E. 2d 377, 62 A. L. R. 2d 1161, 1167.

To support its position that the value of such lots should be based upon comparable value of adjoining unimproved farm land, the State relies upon *Laureldale Cemetery Co.* v. *Reading Co.* (1931), 303 Pa. 315, 154 Atl. 372. This was an action in which a railroad company sought to condemn a strip of land containing 8¼ unused and undeveloped acres running across the northern half of a cemetery consisting of three tracts of land separated by highways and the railroad and totaling about 117 acres. The development, sale of burial lots, and interments were confined to a small part of the south half of the Laureldale property. No interments had been made nearer than 600 feet to the land appropriated. The land taken had no present "productiveness" nor were there any current earnings upon which a value could be based. Neither does it appear that the land appropriated by the railroad had been devoted to burial purposes, nor did the appropriation interfere with the use of the remainder of 117 acres. That is not the situation in the present case as clearly appears from the statement of facts hereinabove set out and which we deem unnecessary to repeat here. For these reasons the Laureldale case is not applicable here and lends no support to appellee's position.

A question similar to that here under consideration was before the New York Court of Appeals in *St. Agnes Cemetery* v. *State, supra,* (1957), 3 N. Y. 2d 37, 163 N. Y. S. 2d 655, 143 N. E. 2d 377, 62 A. L. R. 2d 1161. In that case the condemned strip of land bisected a parcel of approximately 14 acres of land in the southern extremity of an established cemetery containing about 150 contiguous acres of land with over 50,000 interments. The parcel from which the strip of land was taken had been acquired not only

to meet the growing demands for cemetery lots, but because it fronted on a highway which gave a more safe and convenient means of access to the cemetery. The parcel was improved by arranging it as a modern garden-type cemetery and plans had been drawn for the construction of a memorial entrance abutting the highway to the south. The construction of the highway by the State raised an embankment over the condemned strip which destroyed not only the access through the new entrance on the south and the cemetery lots in the area taken, but also depreciated the value of the cemetery lots both north and south of the highway in the separated portion of the parcel from which the strip was taken.

The contention of the State there, as in the present case, was that an "improper theory of appraisement" was used, and that the damages should have been measured by the value of the cost of replacement of the land.

The trial court, following the general rule, found the reasonable market value of the affected area of the cemetery before appropriation and after appropriation. In determining this value, the trial court referred to the sales price which the cemetery had obtained for the sale of burial lots located in the adjoining garden sections. The value of the burial lots in the affected area of the cemetery was determined by applying the unit value based on the average sales price per lot, less sales cost, of the lots sold in the adjoining garden sections to the number of the lots affected.

The trial court in the present case fixed the value by applying the net sales price of lots already sold in the affected garden area and lots sold in adjoining

garden sections to the number of lots taken and affected by the construction of the highway.

It does not appear from the record in the St. Agnes case that any of the lots in the strip taken had been sold as burial lots, nor does it appear whether or not the parcels had ever been platted, while in the present case the lots were not only platted but as hereinabove mentioned 1162 lots, 63 of which were among those appropriated by the State, had already been sold. It seems to us that the circumstances in the present situation make even a stronger case than did the factual situation in the St. Agnes case.

We think the reasoning of the New York Court of Appeals in that case applies with equal force in the case here before us. We adopt the reasoning applied by the New York Court of Appeals in the St. Agnes case and employed by the Supreme Court of the United States in *Elmhurst Cemetery Co.* v. *Commissioner of Internal Revenue* (1937), 300 U. S. 37, 39, 57 S. Ct. 324, 325, 81 L. Ed. 491, 492, which is as follows:

> "We are of the opinion that the valuation for which petitioner contends is reasonable and should be allowed. It is based upon actual sales [of burial lots], and consequently comes as closely as may be to that fair market value, so often judicially defined as the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell."

The method of determining the value of the burial lots affected in the present case, based upon the net sales price of lots already sold in the affected area and on net sales price of similar burial lots in other sections of the cemetery, signifies the "productiveness and capabilities of the

land taken for yielding income as bearing on value—
the present value—of the land itself." *St. Agnes
Cemetery* v. *State, supra* (1957), 3 N. Y. 2d 37, 44,
163 N. Y. S. 2d 655, 143 N. E. 2d 377, 382, 62 A. L. R.
2d 1161, 1168.

There is nothing speculative about the net value
of the lots affected in the "Garden of the Last
Supper" area. They have a present fixed value
readily and fully determined, based upon the
price at which adjoining lots and those within
such Garden have been sold and were selling at the
time of the condemnation. Cf.: *State* v. *Tibbles et al.
supra* (1954), 234 Ind. 47, 51, 123 N. E. 2d 170.

Such value is representative of the true market
value of the lots affected at the time of the taking.
This is the proper rule for determining the
value of land taken in condemnation proceed-
ings. 11 I. L. E., Eminent Domain, §51, p. 608;
4 Nichols on Eminent Domain, 3d Ed., §14.231, p. 328;
§14.232, p. 332.

*Fourth:* Other alleged errors presented by appel-
lant pertain directly or indirectly to the method of
determining value, and the decision which we have
reached on that question is sufficient answer to such
alleged errors as are not specifically considered.

There is sufficient competent evidence of probative
value, without consideration of the question pertain-
ing to the damages to the residue, to sustain the ver-
dict of the jury, and for that reason we have not
considered the questions raised upon this issue.

Appellant having failed to discharge its burden of
showing reversible error, the judgment of the trial
court must be affirmed.

Judgment affirmed.

Landis, C. J., Arterburn and Jackson, JJ., concur.

Achor, J., concurs in result.

NOTE.—Reported in 177 N. E. 2d 655.